# UNITED STATES DISTRIC COURT
# SOUTHERN DISTRICT OF NEW YORK

Madalina Iacob,                          )

               Plaintiff,        )

                         )

      -against-

                         )

Bantam Realty Services LLC,

LG Estates, Inc.,

Opposing Views

Disqus, Inc.,

Korangy Publishing, Inc

Scallywagandvagabond.com

Qrealty

Tribune Publishing

Daily Mail and Dailymail UK

News Corp

Gothamist, LLC

Pinterest, Inc.

               Defendant/s        )

**20 CV 04615**

JUN 1 5 2020

1

I, Madalina Iacob, am familiar with the facts of this claim, and a plaintiff in the above case. I affirm under penalty of perjury that the following defendants have committed copyright infringement by using my pictures in newspaper articles which were not reporting on anything related to the actual pictures used. Defendants:

1) **Bantam Realty Services LLC**
http://www.bantamrealtyservices.com/midtown-renter-slapped-with-300k-lawsuit-for-using-airbnb/
**Bantam Realty Services address: 270 Lafayette St, 409, New York, NY 10012 (Exhibit A-2)**

2) **LG Estates, Inc**
https://www.facebook.com/LgEstatesInc/?fref=ts
**LG Estates Address: LG Estates Inc.**
**CEO Laverne Goulbourne: laverne@nylivingsolutions.com**
**214 West 29th Street, Suite 1502**
**New York, NY  10001**
**(Exhibit A-3)**

3) **Opposing Views**
http://www.opposingviews.com/i/society/new-york-city-tenant-sued-300k-landlord-over-airbnb-rental-fines
**OpposingViews email and address:**
**DMCA email: editorial@rndr.com and  legal@opposingviews.com**

2

4) **Opposing Views, 145 S. Fairfax Ave., #405, Los Angeles, CA 90036**
**Tel: 310-531-7400**
**(Exhibit A-4)**


5) **Disqus, Inc**
https://disqus.com/home/discussion/scallywagandvagabondcom/madalina_iac
ob_sued_for_300K_by_landlord_for_illegal_airbnb
**Disqus Address: dmca@disqus.com**

**717 Market St**
**San Francisco, CA 94103**
**(Exhibit A-5)**


6) **Korangy Publishing Inc**
https://therealdeal.com/2015/12/19/tenant-hit-with-300k-lawsuit-for-using-
airbnb/
**The Real Deal**
**Korangy Publishing Inc.**
**450 West 31st Street**
**New York, NY 10001, US**
**(Exhibit A-6)**


7) **scallywagandvagabond.com**
https://scallywagandvagabond.com/2015/12/madalina-iacob-sued-300k-by-
landlord-for-illegal-airbnb-rentals
**ScallyWag Contact Address: christopher@scallywagandvagabond.com**
**169 Bowery St, New York City, New York 10013 US**

(Exhibit A-9)

8) **QRealty**

http://qrealtyny.com/midtown-renter-slapped-with-300k-lawsuit-for-using-airbnb/

Qrealty Contact Address: 500 4th Ave, Brooklyn, NY 11215

(Exhibit A-10)

9) **Tribune Publishing**

http://www.nydailynews.com/new-york/manhattan/midtown-woman-faces-300g-lawsuit-renting-pad-airbnb-article-1.2470620

NYDailyNews Contact Address:  4 New York Plaza; Manhattan, New York City, US

Owner: Tribune Publishing

copyrightnotice@tripub.com

The Site's copyright agent can be reached as follows:

Copyright Agent, 160 N. Stetson Avenue, 3rd Floor, Chicago, IL 60601, 312-222-4643(voice), 312-222-4567 (fax)

(Exhibit A-11)

10)      **Daily Mail and General Trust**

http://www.dailymail.co.uk/news/article-3366975/NYC-woman-sued-300K-landlord-repeatedly-subletting-apartment-Airbnb.html

Owner: DMGT

dataprotection@dmgmedia.co.uk

Legal Department – Data Protection & Privacy

Associated Newspapers Limited

Northcliffe House

2 Derry Street

London, W8 5TT

U.K.

11)     Daily Mail Online

Dailymail US: Address: 51 Astor Pl, 9th Fl, New York, NY 10003

https://www.facebook.com/DailyMail/posts/1113869445339469

(Exhibit A-12)

12)     News Corp

http://nypost.com/2016/12/25/life-coach-sues-gothamist-after-online-commenters-call-her-hooker/

Owner: News Corp

13)      **NY Post Contact Address: legal@nypost.com**

**1211 Avenue of the Americas; New York City 10036**

**(Exhibit A-13)**

14)      **Gothamist, LLC**

**https://gothamist.com/2015/12/19/midtown_woman_sued_by_landlord_for.ph**

**p**

**Gothamist, LLC Contact Address:**

**New York Public Radio**

**160 Varick Street, 8th Floor**

**New York, NY 10013**

**(Exhibit A-21)**

15)      **Pinterest, Inc**

**https://www.pinterest.com/pin/454722893606623024/**

**Pinterest Copyright Agent: copyright@pinterest.com**

**651 Brannan Street**

**San Francisco, CA 94107-1532**

**(Exhibit A-26)**

Plaintiff, Madalina Iacob, alleges as follows:

**Factual Allegations**

Plaintiff Madalina Iacob has been modeling since 2009, collaborating with photographers, make-up artists and building a portfolio which would help her build a public image and business, while also arranging and taking selfies by placing her phone or camera in a tripod and using the timer

6

feature of 10 seconds. All these photographs were taken after careful consideration was given to the message of the picture, the emotions which plaintiff wanted to evoke in followers, the outfits and setting which were supposed to be used in order to create a unique picture which will be used for exhibition and in the development of a business and public image. Plaintiff pursued a lifelong dream of building a business and coaching female empowerment, finishing college with a Bachelor of Business Administration degree and minoring in Psychology in 2009. Furthermore, starting in 2012 Plaintiff enrolled in coaching trainings and got certified as a Neuro Linguistic Programming, Emotional Intelligence and Strategic Intervention Coach (Working with Women Specialization), in order to combine these coaching techniques and build a coaching practice. All of these steps taken by Plaintiff such as modeling, the choice of major and minor in college, certifications as coach, were done as pre-requisite steps towards building a coaching practice which would focus on female empowerment. The guarantor Darpan Thakur was the first to offer plaintiff to build her website and help her with the technical aspects of building her coaching business and he did build her website and helped her initially, until plaintiff said that she will hire a professional because she does not like how the website looks. Ironically, or not, plaintiff's coaching business got destroyed, her reputation, income producing opportunities, social standing also because of the lawsuit filed against her by 357 W 54th St, where fraud was committed on the lease on which the lawsuit was filed on, by erasing the name of the same guarantor Darpan Thakur.

Ms Iacob has put work and effort into finishing college, getting certified, modelling, researching and writing on her website, writing books, posts on her website and social media platform Facebook, in order to build a coaching business, earn a living and establish herself in the industry. Plaintiff built her website and started posting her modeling pictures and selfies, writing articles and posting on her personal Facebook page to which she created and attached a business page promoting her work, in order to build a following and promote her business. She then wrote her first book and published it on her website and Amazon, in March 2015, giving it for free with the same goal of building a following and business, wanting to establish herself faster in the industry. Then, Plaintiff wrote a second book around September 2015, which she put up for sale at a low price of $5. While still working on some editing for the second book and doing research for a third one, Plaintiff was also posting on her official Facebook business page which she

created in February 2015, where she was advertising her books, writing articles about personal development and using her pictures in order to build her business. Before publishing the first book, Plaintiff drove 4 hours to do a photoshoot with a photographer she worked with in the past, in order to have material for her book which was published on March 26th, 2015, and pictures from this photoshoot were infringed upon as well.

**17 U.S. Code 411(a) specifies:**

Except for an action brought for a violation of the rights of the author under section 106A(a), and subject to the provisions of subsection (b),[1] no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.

In order to successfully bring a claim of copyright infringement, the following elements must generally be proven:

1) "The person bringing the claim must be the owner of a valid copyright that is registered with the U.S. Copyright Office". Plaintiff is attaching here the copyright certificates registered with the Office of Copyright.

2) "The work was actually copied by the infringer. This can be proven by showing either that the infringing work is basically a duplicate of the original, or that the infringing work is "substantially similar" to the original and the infringer had access to the original". In this case as it can be seen from the evidence attached the pictures were copied in entirety and then used by newspapers, websites etc along with the articles or just short snippets mentioning the articles, which shows that the main idea of all this was to have plaintiff's pictures infringed, her life and work, career and business aspirations destroyed. Access was available since the pictures were public because plaintiff was using them to build a following and her business.

3) "If only parts or portions of a copyrighted work are copied, that these sections of the work are protected by copyright". In this case as mentioned the pictures were copied in entirety and they are protected by copyright.

## 17 U.S. Code § 501. Infringement of copyright

Plaintiff brings this action in court due to an infringement of her copyright according with title 17 U.S. Code § 501(a) and (b).

a) "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be".

b) "The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it. The court may require such owner to serve written notice of the action with a copy of the complaint upon any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright, and shall require that such notice be served upon any person whose interest is likely to be affected by a decision in the case. The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright."

## 17 U.S. Code 106 Exclusive rights in copyrighted works

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

 (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly;

**Public Distribution. —Clause (3)** of section 106 establishes the exclusive right of publication: The right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." Under this provision the copyright owner would have the right to control the first public distribution of an authorized copy or phonorecord of his work, whether by sale, gift, loan, or some rental or lease arrangement. Likewise, any unauthorized public distribution of copies or phonorecords that were unlawfully made would be an infringement.

**Right of Public Display. —Clause (5)** of section 106 represents the first explicit statutory recognition in American copyright law of an exclusive right to show a copyrighted work, or an image of it, to the public. The existence or extent of this right under the present statute is uncertain and subject to challenge. The bill would give the owners of copyright in "literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works", including the individual images of a motion picture or other audiovisual work, the exclusive right "to display the copyrighted work publicly."


**17 U.S. Code 106A(a) Right of certain authors to attribution and integrity**

(a)RIGHTS OF ATTRIBUTION AND INTEGRITY.—Subject to section 107 and independent of the exclusive rights provided in section 106, the author of a work of visual art—

(1) shall have the right—
(A) to claim authorship of that work, and
(B) to prevent the use of his or her name as the author of any work of visual art which he or she did not create;

(2) shall have the right to prevent the use of his or her name as the author of the <u>work of visual art</u> in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation; and

(3) subject to the limitations set forth in section 113(d), shall have the right—
(A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and
(B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

(b) SCOPE AND EXERCISE OF RIGHTS. —Only the author of a work of visual art has the rights conferred by subsection (a) in that work, whether or not the author is the copyright owner. The authors of a joint work of visual art are co-owners of the rights conferred by subsection (a) in that work.

### 17 U.S. Code § 107. Limitations on exclusive rights-Fair Use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include:

**The four criteria are:**

1. **<u>Purpose and character of the use, including whether the use is of a commercial nature or is for nonprofit educational purposes</u>.** Newspapers were not commenting/reporting or criticizing plaintiff's modeling pictures, they were reporting on the lawsuit, therefore the copying and usage of the pictures produced unnecessary copyright infringement and had no purpose or reason to be used while reporting on the lawsuit. Nonprofit educational and noncommercial uses are more likely to be fair use. Additionally, "transformative" uses are more likely to be considered fair. Transformative

uses are those that add something new, with a further purpose or different character, and do not substitute for the original use of the work. As mentioned before the usage of the pictures was not nonprofit or noncommercial, on the contrary, it either generated sales and increased traffic through the sexy images displayed and scandal around Plaintiff's image, since Plaintiff used to model and her looks, and outfits increased revenue and traffic for those illegally using Plaintiff's images in their articles and websites. A mutilation of the original intent of the works, with a brainwashing effect on the readers and viewers which were steered in the direction of forming a negative opinion regarding Plaintiff's character and lifestyle ensued after the infringement took place. This completely substituted for the original use of the work, since Plaintiff is proud and grateful for her looks, and she was using her images in order to build her business which has been focusing on working with women, empowering women to own their sensuality, confidence and strength. Plaintiff encouraged women to be proud of their bodies, minds and souls, to take care of their bodies, to not compromise for what they want in life, to be ambitious and build their careers, to know what they want out of life and go for it, to be fighters, as well as sensitive and soft with their chosen partners, and not let themselves bullied or intimidated by anyone. She promoted a fierce independence, a sense of knowing what you want out of life and breaking barriers imposed by prejudice, misogyny and male dominance still prevailing around the world. All of that was taken away from her, and her pictures willfully infringed upon, producing character assassination and destruction of business and life circumstances, deterioration of health and tremendous humiliation, pain and suffering. Links were used online from the news articles written and her name showing up under websites such as "exoffenders.com", portraying her as some sort of criminal, sex worker etc. If someone stands to gain anything monetarily from using the work, that will almost always be a violation of copyright law. On the other hand, non-commercial use is not always acceptable either. This specifies the context of the use itself. In plaintiff's case all of her pictures were used for monetary gain by newspapers who chose plaintiff's sexiest pictures in order to create sensational news and attract more sales. Sex appeal sells, and that is why it is used in all commercials, movies, etc. Newspapers were supposed to report on the lawsuit, the reporting did not have anything to do with commenting or reporting on the pictures

or plaintiff's modeling career. Instead the pictures were attached in order to promote more sales and created a scandal around plaintiff's name which now had a face and body attached to it, so that everyone can be aware of it. Reporting on the lawsuit, did not mean that defendants had a right to copy and use plaintiff's pictures and take away from her the opportunity of building a following and her own business, or to destroy her reputation, honor and social standing, as well as income or career opportunities.

2. **Nature of the copyrighted work**: Using a more creative or imaginative work (such as a novel, movie, or song) is less likely to support fair use than using a factual work (such as a technical article or news item).As explained above, the articles could have been written without the usage of the pictures, which did not add anything to the article, besides creating a false image regarding Plaintiff's character and lifestyle, all based on a fraudulent lawsuit filed against Plaintiff.  The copyrighted work again did not have anything to do with reporting on the lawsuit. The photographs were works of art created around well thought concepts, meant to help plaintiff build her business and there was absolutely no relation between the pictures and reporting on the lawsuit. If a work can substitute and supersede by making use of someone else's original work, this is more than likely going to be a case of infringement. Is generally understood to deal with issues such as the cultural importance of the work, its newsworthiness, and whether it is a published or private work. In plaintiff's case again it is mentioned that the reporting on the lawsuit did not need to have attached plaintiff's pictures, the reporting on the news could have been done simply, the way it usually is done, without copying and using a person's pictures. The pictures were used for monetary gain and sensational news creation.

3. **Amount and substantiality of the portion used in relation to the copyrighted work as a whole**: Courts look at both the quantity and quality of the copyrighted material that was used. Using a large portion of the copyrighted work is less likely to be fair use. Using even a small amount of a copyrighted work was determined not to be fair use because the selection was an important part—or the "heart"—of the work. Again as explained above,

13

the work was used in its entirety, the pictures were basically copied from the social platforms, books or website where Plaintiff was using them as a medium of expression of her work in order to promote a following and build her coaching business, and then illegally used in the news articles written about her regarding the lawsuit filed by 357 W 54th St against her. As it can be seen, even the background picture that Plaintiff has on her Facebook personal page is one aligned with the coaching practice and principles of her business, showing a Buddha and a quote meant to show the NLP and Emotional Intelligence principles written about by Plaintiff, such as we attract reality with our thoughts and our emotions. Plaintiff has been writing about God and the Universe since 2012, and starting 2015 she has been abused verbally on the street by strangers who told her to stop writing about energy as being universal and all expressions ok, and instead asked to convert to Islam and write about that. She was told she needs to become a sexual slave and "pay for her sins". Plaintiff has been living with anxiety medication, panic attacks, has been finding threats left for her through different avenues, stalked constantly on the street and harassed, and pressured to accept what is being asked of her, such as providing her harassers money through services of sexual slavery in order to generate cash and pay for her sins. Plaintiff was told that she is too proud about her looks and intelligence and she has been treating men who fell in love with her very bad, and because of that she needs to be humbled and transformed into a sexual slave and pay for her pride, which she was told is one of the seven capital sins. The amount of the work used, has obvious reasonability. It should be noted, though, that use of a complete work (such as a reproduction of an entire painting or picture) does not disqualify a determination of Fair Use. In plaintiff's case her pictures were not mentioned, or used in part, they were copied and pasted in the articles and websites, were the news was about a completely different topic, respectively the lawsuit. On some of the websites, even after plaintiff was sending copyright infringement letters, the owners and journalists refused to take them down and continued to re-upload them on a daily basis on 6-7 pages full with plaintiff's pictures. These are the websites which plaintiff saw show up over the night and believes were intentionally created in order to facilitate this cyberbullying campaign.

4. **Effect of the use upon the potential market for or value of the copyrighted work**:
   Here, courts review whether, and to what extent, the unlicensed use harms the existing or
   future market for the copyright owner's original work. In assessing this factor, courts
   consider whether the use is hurting the current market for the original work (for example,
   by displacing sales of the original) and/or whether the use could cause substantial harm if
   it were to become widespread. As explained before the willful copyright infringement of
   Plaintiff's pictures has completely destroyed not only the value of the pictures which
   were meant to help build Plaintiff's coaching business of empowering women, but has
   produced a complete character assassination of the Plaintiff. Newspapers, journalists and
   website owners knew they were illegally copying plaintiff's pictures from her social
   media platforms and website, where these pictures were displayed in order to attract a
   following and build a coaching business, but even after they were asked to take them
   down, even sent DMCA's, they refused to do that. The willful copyright infringement
   was deliberate and a complete disregard for law and civil rights of Plaintiff was
   displayed.
   In addition to these four factors, the statute also allows courts to consider any other
   factors that may be relevant to the fair use analysis. Courts evaluate fair use claims on a
   case-by-case basis, and the outcome of any given case depends on the specific facts of
   that case. Here Plaintiff wants to add that all these newspapers and websites committing
   willful copyright infringement did not ask plaintiff what her side of the story is when they
   wrote about the lawsuit.
   Plaintiff's pictures have been used and re-used, they have been constantly uploaded on
   new websites and the copyright infringement perpetuated, while Plaintiff has been
   suffering verbal and physical attacks on the street, where she has been constantly
   pressured and asked to drop the lawsuit with 357 W 54th St and agree to conditions
   imposed on her. Some defendants, such as dailymail.co.uk and NY Post refused to take
   the pictures down even after copyright infringement letters were sent and evidence shown
   that the pictures are registered. Moreover, the same defendants used several pictures,
   some of them 6 or 7 pictures in one article, exhibiting no concern for willful and obscene
   copyright infringement. The usage of several pictures in one article, or even one did not
   constitute fair use since each, and every article was reporting on the lawsuit and did not

constitute any reporting or criticism of the actual modeling pictures. Fair use had to be applied to the actual piece of information that the news is concerned with, and in this case the lawsuit was the news, not news about plaintiff's modeling career or pictures in question. If you use a larger portion of a work (or the entirety of it), you're more likely looking at a case for infringement, then if you mention it or use parts of it such as quotations. A perfect copy of a work thinly disguised as a commentary may divert sales away from the original. In plaintiff's case a complete stigma ensued after the pictures were copied and used in newspapers and websites, and it destroyed the value and work put into the photoshoots and concepts used for the development of plaintiff's coaching business. If plaintiff put work into researching and writing, modeling and using all this in order to build a coaching business, the newspapers and websites copied the pictures and the usage of the pictures destroyed plaintiff's reputation and honor, social standing, business opportunities, career opportunities, personal right to peace and happiness.

If you copy a picture and use it to generate sales, while you comment on something else but the picture itself, it does not count as Fair Use, because you are using the image to illustrate your post and generate sales, not commenting on the image itself.  The courts might regard as fair use under the circumstances: ''quotation of excerpts in a review or criticism for purposes of illustration or comment; quotation of short passages in a scholarly or technical work, for illustration or clarification of the author's observations; summary of an article, with brief quotations, in a news report. As under the present law, a copyrighted work such as a picture would be infringed by reproducing it in whole or in any substantial part, and by duplicating it exactly or by imitation or simulation, especially when the article you are writing is not about the picture or the nature of the picture. You cannot exploit someone's intellectual property for your own commercial or personal uses and then look for a technicality or some specific legal reason why it "counts" as Fair Use.

In some ways, it might have made sense if this had been called "Fair Mention," because the circumstances where the <u>exemption applies are really cases of mentioning the work rather than using it</u>. In this case the articles did not mentioned plaintiff as being a model only, but actually copied and used her sexiest pictures in order to generate sales. The copying and

usage of plaintiff's pictures, with a selection of certain pictures which evoked more of a sexual appeal for public was intentional and employed in order to generate sales for the infringers, while they destroyed plaintiff's chance of making money with those pictures, develop her business and build a following and clientele and also destroyed her image, reputation, business, income, social life and standing, emotional health, and tainted her with stigma and unfair portrayal. Defendants should be punished for their particularly egregious conduct, especially those that received copyright infringement letters and continued to keep the pictures up, regardless of the damage they did, to deter such conduct in the future. To obtain punitive damages, the plaintiff usually needs to show that the defendant acted with malice, negligent and willful copyright infringement. Mental anguish is a legal term that refers to a high level of psychological trauma that one party inflicts upon another. Being called a hooker, a criminal an ex-offered, having all sorts of malicious comments and assumptions made about plaintiffs' persona, character, lifestyle, or life choices by anonymous online commenters produced and still produces a complete loss of reputation, happiness and personal or business opportunities. The copying and usage of plaintiff's pictures attached to the articles written, exposed plaintiff to public contempt, ridicule, aversion, disgrace, produced character assassination, loss of credibility, business and employment opportunities, loss of income, and brought social stigma. The Fair Use clause of providing the public with news regarding the lawsuit with 357 W 54 St did not need to employ a copying and usage of plaintiff's pictures and there was no compelling interest for the public to do so, or reason for journalists and others to commit copyright infringement. It was not only grossly negligent and willful copyright infringement, but it presented itself as a malicious cyberbullying campaign which destroyed plaintiff's life, and seems to come as retaliation and revenge. 357 W 54th St sued plaintiff for breach of contract and went as far as committing fraud on the lease on which the lawsuit was started on by removing the name of the guarantor. Darpan Thakur, the guarantor, romantically pursued plaintiff from 2012 to 2014 and got rejected on a daily basis for 2 years. Plaintiff has 2 years of emails which show exactly what she is saying here about guarantor pursuing her and her rejecting him on a daily basis. Plaintiff accepted his help with the website and business as a friend, and whenever the guarantor would start declaring his love for her she would stop him and tell him it will never happen and if he continues to mention leaving his family and loving plaintiff she will stop talking to him even as a friend. In those moments the guarantor would apologize, ask to be forgiven and say that he will never say he loves plaintiff,

but every email he would send her would end with "I love You". Also from the emails it can be seen that the guarantor tricked plaintiff into believing he feels very bad because of what happened to her at Bridgewater, where her manager and CIO was demoted from his position after plaintiff reported him to HR, and then kept as a consultant while plaintiff was offered a severance package and told that it is better to leave the company. Plaintiff before leaving asked to be moved so she can stop working with her manager Gol Ophir, now a consultant, and it never happened while she was told that a position in another department is being secured for her, but they will not be able to move her to the PMO department anymore, where she was promised to be moved to initially when she asked to work for a woman.

Since 2014 plaintiff has been stalked and threatened constantly and told that the guarantor Darpan Thakur and a previous manager, Gol Ophir, who was a lawyer, were both in love with plaintiff and because she rejected both of them and did not want to have sexual relations with them, the 2 men will be revenged no matter how much it costs, because a sexual harassment lawsuit needs to be avoided at all costs. Plaintiff was told by strangers on the street walking behind her that she needs to accept to become a sexual slave and if she does not accept then there will be other ways of destroying her, and then she will have no choice but accept what is being asked of her. It is plaintiff's opinion that way too many resources have been invested in order to constantly harass and destroy plaintiff, and that corruption has been prevalent all these years, all in order to destroy plaintiff and force her to accept the conditions and in these manner make everyone involved in this sexual harassment campaign feel safe that she will not file a lawsuit for sexual harassment. The obstacles that plaintiff has been seeing put in front of her and the blatant corruption she saw it is absolutely appalling, and it is clear that it is done with a purpose. No company such as 357 W 54th St should commit fraud on a lease by erasing the guarantor and then file a lawsuit, and no newspapers should willingly expose themselves to copyright infringement and blatantly refuse to take the pictures down even when they are sent copyright infringement letters and told that the pictures will be registered. 357 W 54th St filed a lawsuit and committed fraud on the lease, then asked for a huge amount in order to create scandal and sensationalism, then newspapers committed copyright infringement and extensively covered the story, along with private individual on their websites, blogs, or websites popping up overnight which extensively used plaintiffs' pictures. The internet has been used as a cyberbullying campaign where plaintiff's pictures have been copied and used in newspaper articles, and also on

fabricated porn websites, while plaintiff was stalked and told that if she does not give up the fight she will be kidnapped and raped in the same manner she sees next to her pictures online. Plaintiff's pictures have also been attached to fabricated websites which pop up overnight for the past 4 years, meant to subliminally attack plaintiff and send those that know her defamatory messages about her character and reputation. All these methods of attack cost money, and somebody seems to have an interest in spending lots of money in order to continue to destroy plaintiff's life and make sure she does not become stronger so she can expose all the sexual harassment, stalking, cyberbullying etc she has been suffering all these years. It is plaintiff's opinion that this might be a coordinated bullying campaign of character assassination and life destruction in order to cover up a bigger scandal, such as a sexual harassment scandal and continued aggravated harassment that would damage the reputation of her past employer Bridgewater Associates, and that of the 2 men Gol Ophir and Darpan Thakur, men which seem to be at the root cause of all the pain and suffering that plaintiff has been suffering these past years. Lots of damage has been done and may people employed in this campaign, and those that try to help plaintiff get attacked as well, and the only people with motive to destroy plaintiff are the ones that all this started with, in order to cover up what happened and what needs to stay covered up, according with their interests. Plaintiff was employed by Bridgewater Associates on a temporary contract of 3 months in 2011, with a potential for conversion into permanent based on plaintiff's performance. Plaintiff finished a BBA here and was supposed to enroll in Graduate School- wishing for a Master in Positive Psychology, when all this started and stopped everything in her life. Plaintiff has worked in the corporate environment for years before she got hired at Bridgewater. At Bridgewater, after only 1 month, instead of 3, she was told by one of the 3 managers she was working with as an Executive Assistant, respectively the CIO Gol Ophir, that her performance is excellent and they would not want to lose her after 3 months, and accordingly converted plaintiff's contract into a permanent one. Bridgewater is an environment where you are supposed to constantly excel and improve, to challenge yourself and believe in truth and integrity. Therefore, plaintiff studied intensely when a 4-hour exam was given to all employees, exam meant to promote those doing well and modify the organizational charter, and scored in the 90% percentile. She constantly asked to be involved in projects outside of her responsibilities as an Executive Assistant, and she was given 1 project. Everybody was happy and said she was doing a good job on it, but after a few months, around January 2012 Gol Ophir

started micromanaging her work on the project and in general, and he told plaintiff she will not allow her to move into a different position within the company. Gradually she started seeing alarming signs of innuendos and sexual advances, deflected them and still tried to move to another department, respectively the Project Management department where she would have worked as Executive Assistant for a woman while also get more opportunities to work on different projects and advance. Plaintiff approached HR, told them she cannot work with Gol Ophir anymore, told them why, and asked to be moved. The woman executive in the PMO department was happy to welcome her in the team and approached HR as well asking for the transfer. In the meantime, Gol Ophir told plaintiff he knows what she is trying to do, respectively move into the PMO, and he will never allow her to leave him. The HR department realized what is happening and demoted Gol Ophir from his position of CIO and promised plaintiff they will move her to PMO. Shortly plaintiff started seeing a hostile environment created around her by certain co-workers and started being accused of not doing her job properly, respectively refusing to schedule certain meetings. When she will provide evidence of the false allegations being brought against her, showing that she looked for availability, offered those available times and every option was rejected, while her manager was telling her he does not want to have that meeting, the evidence got ignored. Plaintiff was asked to take a severance package and leave the company while saying that it is partly her decision to leave as well and to give an exit interview where she will mention she agrees with leaving and she will not file a lawsuit. Plaintiff realized that she is being sabotaged and attacked because of the demotion Gol Ophir suffered and had to leave because she was threatened that if she does not leave then she will be assaulted, raped and killed. She left forced by the circumstances, but never agreed to give the exit interview. Throughout all these problems at work, Darpan Thakur, a co-worker started approaching plaintiff around the office, coming daily to her desk bringing her fruits or snacks from the kitchen and talking to her about her troubles. He started pursuing plaintiff fervently and writing daily love emails asking her to let him help her because he hates what Bridgewater is doing to her due to Gol Ophir's demotion. He helped her with business and signed as a guarantor when plaintiff got the apartment at 357 W 54th St. The day plaintiff left Bridgewater he called her around 15 times and then told her that he was desperate that she might be depressed and she needs to allow him to help her coaching business, because he is an engineer and knows how to build a website and can help her. He pursued her obsessively for 2 years, helping her while constantly saying he loves

her, and he wants to leave his family and be with plaintiff. In each and every conversation as well as email conversation plaintiff told him that she appreciates the help, but there will never be anything else between them. Finally, after 2 years Darpan Thakur stopped sending so many emails, but plaintiff started being attacked through all sorts of third parties and avenues. Therefore, it is plaintiff's opinion that the unfortunate events happening in her life since 2012 are not a coincidence, but a campaign meant to destroy her. 357 W 54th St filed a lawsuit based on fraud, asked for a ridiculous sum of money, respectively $300K and then $500K, in order to create scandal. No judge or court would ever approve with these amounts asked, but they were used to humiliate and create sensational news. Moreover, newspapers according with their right to report on news, did not have a reason to commit copyright infringement and duplicate plaintiff's pictures in order to report on the news of the lawsuit. The duplication and usage of plaintiff's pictures was done because it produced sales, based on the plaintiff's physical attributes and managed to reverse the purpose of the pictures. If plaintiff used her pictures to promote her business and establish her name as a coach for female empowerment, the attaching of the pictures to newspaper articles where plaintiff is accused of doing Airbnb produced not only copyright infringement, but character assassination, and destruction of all life and business opportunities for plaintiff. Moreover, plaintiff's case was sabotaged and lost due to the illegal behavior of her lawyer Mustapha Ndanusa, who closed discovery without plaintiffs' consent in April 2017 after plaintiff told him in a conversation that she is having an older computer restored and she will provide the court with proof of fraud committed by 357 W 54th St on the lease along with the emails already presented which show the presence and participation of the guarantor at the signing of the lease, as well as impossibility of plaintiff to secure a lease without a guarantor. Plaintiff is giving the court now all the background motives of why this copyright infringement might have happened at the large scale that it did and is asking the court to take into consideration the extent to which the law has been broken in order to create this present situation and a complete destruction of plaintiffs' life and business. This lawsuit is not concerned with plaintiff's personal struggle, but plaintiff believes the background of the infringement campaign should be explained now, since there is no reason for it later on, in order to explain the possible root causes and motives of this infringement. Until 2015 and this lawsuit plaintiff was employed and made around 80-90K a year. After the lawsuit plaintiff lost income opportunities, applied to job, but was not able to secure them since she was always asked about the nature of the

information attached to her name online in articles, and then told the company decided to choose another candidate. Actual damages can also include losses for which money is only a rough substitute, such as shame, mortification, or pain and suffering experienced by the plaintiff.

The court can assume that the plaintiff has suffered harm to his or her reputation, pain and suffering, loss of income, business and opportunities or some other loss. Plaintiff has suffered tremendous humiliation and character assassination, and mental anguish suffering and taking anti-anxiety and antidepressants medication since 2015. Plaintiff is seeking monetary compensation for actual damages and from the profits made by all infringers through the copying and usage of her pictures.

**17 U.S. Code § 405. Notice of copyright: Omission of notice on certain copies**

Under the general scheme of the bill, statutory copyright protection is secured automatically when a work is created, and is not lost when the work is published, even if the copyright notice is omitted entirely.

405 (2) if registration for the work has already been made or is made within 5 years after the publication without notice, and a reasonable effort is made to add notice to copies or phonorecords publicly distributed in the United States after the omission is discovered. Thus, where the infringement is completed before actual notice has been served—as would be the usual case with respect to relatively minor infringements by teachers, librarians, journalists, and the like—liability, if any, would be limited to the profits the infringer realized from the act of infringement. On the other hand, where the infringing enterprise is one running over a period of time, the copyright owner would be able to seek an injunction against continuation of the infringement, and to obtain full monetary recovery for all infringing acts committed after he had served notice of registration.

**17 U.S. Code § 410. Registration of claim and issuance of certificate.**

(c) In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate

(d) The effective date of a copyright registration is the day on which an application, deposit, and fee, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, have all been received in the Copyright Office.

**17 U.S. Code § 411 Registration and civil infringement actions**

If registration is made within 3 months after publication of the work, it is possible to collect statutory damages and attorney's fees in infringement actions (otherwise only actual damages may be collected and monetary compensation from profits made by infringers.

Attached as evidence are certificates of registration along with the dates of infringement of the pictures. As it can be seen some of the pictures were registered in July 13th, 2015, therefore plaintiff can collect restitution by the end of the lawsuit either through statutory damages and legal fees or by actual damages and profits made through the infringement. The rest of the photographs were registered on February 15th, 2017, which is within the 5 years limit of statue 410(c). Plaintiff therefore has a copyright claim on all photos, and for the ones that were registered in 2017 plaintiff will ask for actual damages and damages from profits following infringement.

A work can be registered at any time, before or after infringement. This means that in an infringement suit, if your registration was timely within the 5 years, the burden of proving your copyright is invalid will fall on the defendant. If you do not register your work prior to the infringement or within three months of publication, your remedy in an infringement action is limited to the actual damages you suffered from the infringement (and any of the infringer's additional profits that are attributable to the infringement), as well as injunctive relief (e.g., a court order restraining the defendant from copying the work).

**17 U.S. §504 Remedies for infringement: Damages and profits**

(a) In General. Except as otherwise provided by this title, an infringer of copyright is liable for either

(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c).

(b) Actual Damages and Profits. The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. Actual damages are compensatory damages somewhat quantifiable and are meant to restore the injured party, as nearly as possible, to the position he or she would have been in had the wrongful conduct never occurred.

Actual damages include all financial losses the plaintiff has suffered with respect to his or her property, business, trade, profession or occupation. For example, any lost income, or lost earning capacity. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

(c) Statutory Damages.

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are li-able jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000.


Anytime you take someone else's photo from a social media page and repost without permission - even if you are in the picture - you are breaking the law. Facebook and Instagram, have it in the fine print, buried in the help center under "image privacy rights." Her website, Facebook and Instagram, places from where plaintiff's pictures were copied and infringed upon, do not have any copyright rights over the pictures presented on their platform and they mention that in their fine print. By taking plaintiff's pictures, copying them and using them in news articles and

websites, defendants infringed upon plaintiff's copyright, intentionally and completely altering and mutilating plaintiff's honor, reputation, character, image, life and business opportunities and social standing. The message transmitted by plaintiff in the pictures was completely mutilated and distorted, changed from a positive image of confidence, sex appeal, determination to succeed, empowerment, and purpose of promoting a positive role model as well as building a business, and changed into an image of a person lacking values, a person of questionable character, a potential sex worker, as some anonymous commenters said online. Plaintiff was told that those commenters were asked to do that, while others were asked to report about the lawsuit on their websites while using cynical and denigrating sentences regarding plaintiff, her business and persona. Plaintiff was told that many websites were also built with this purpose in order to use words that will be associated with plaintiff's name in google searches and spread a false and belittling light around plaintiff. The commentaries made in Gothamist by people reading the article and seeing plaintiff's pictures are proof of how the public received and evaluated plaintiff. Plaintiff was called all sorts of names by different commentators due to the illegal usage of her pictures, and the intentional choosing of pictures with a strong sex appeal. Fair use would have been reporting on the lawsuit, and no illegal usage of plaintiff's pictures was necessary. The fact that pictures were used along the articles, completely destroyed plaintiff's life, while it did not contribute at all to a public interest. The public could have read on the lawsuit and not have to see plaintiff's pictures. The only ones benefiting from this infringement were the infringers who exploited the opportunity of creating juicy articles and making money through illegal usage of plaintiff's pictures. Infringers selected pictures and attached them so they can create scandalous and juicy articles that would generate sales due to the physical characteristics of the plaintiff, while also helping tremendously to generate a public cyberbullying campaign of denigration and complete destruction of plaintiff's reputation, honor, personal and business opportunities and social standing.

In November 2016, plaintiff did contact Gothamist and Disqus and informed them that she will file a lawsuit for defamation against them and commenters who cyberbullied her and insulted her vicious maliciousness. In February 2017 after plaintiff filed the lawsuit for defamation against Gothamist, plaintiff was approached by a man in Central Park while she was relaxing and reading a book. He stopped 2 feet away from her and said "you are fighting and filling lawsuits?

Your pictures on backsexy.com. What you will see there is what you should expect from us. If you don't stop the fight we will kidnap and rape you exactly like that. "

Fearful and shocked plaintiff started looking online not knowing what backsexy.com was or what is being done. While looking for the website backsexy.com she saw that the articles she was aware of were not the only ones and that the internet had many more articles. She became infuriated with what she saw online and decided to register her pictures and send copyright infringement letters to all responsible parties.

Plaintiff is entitled to seek actual damages and damages from profits made from infringement for loss of opportunities, income, reputation, character assassination, mental anguish, as well as damages from the profits made by the infringers selling their articles where they copied plaintiff's pictures and used them in the articles. In many circuits, there is a presumption of irreparable harm if the owner of a copyright has made a substantial showing of infringement. *E.g., Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 611 (1st Cir. 1988); *Accusoft Corp. v. Mattel, Inc.,* 117 F. Supp. 2d 99, 102 (D. Mass. 2000) ("In the copyright context, irreparable harm is presumed if the copyright holder has shown a likelihood of success on its infringement claim."). There is a similar presumption that an injunction will serve the public interest. *E.g., Concrete Mach. Co.,* 843 F.2d at 612 ("Since Congress has elected to grant certain exclusive rights to the owner of a copyright, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work."); *Flomerics Ltd. v. Fluid Dynamics Int'l., Inc.,* 880 F. Supp. 60, 61 (D. Mass. 1995) ("[T]he public interest is not a 'genuine' issue because it is virtually axiomatic that the public interest can only be served by upholding copyright protections.").

The infringement was willful and done in order to generate sales, through a strategic choice of pictures picked, and the mannerism in which the articles were written, all meant to generate sales, portray scandal, mutilate her character, business and lifestyle, manipulate and exploit Plaintiff's features and sex appeal expressed in certain pictures chosen by defendants. Defendants chose certain pictures and used some of them over and over again, in order to generate profits, and traffic, without caring about the humiliation, danger, or destruction caused of Plaintiff's work, business, character, life and health.

26

Since 2009 Plaintiff in order to promote her business of coaching female empowerment has been taking modeling photos as well as selfies, photos in which she expresses emotions of love, sensuality, intimacy, glamour, flirtation, sex appeal, happiness, sexual power and confidence. More specifically, she has been fascinated all her life with powerful women both past and contemporary, women who have not been afraid to embrace and celebrate their sensuality and beautiful features or curves. She wanted to build a business, write books and hold seminars where she can gather with other women and celebrate their femininity, the amazing gifts of being a woman, and promote a feeling of sisterhood. Plaintiff decided to go to school and build a business which will help her empower women, coach them and help them become motivated and inspired to shape their bodies, change every aspects of their life they do not like, and take actions which will bring about life circumstances they do want and would bring happiness. Plaintiff has been using her own beauty, sex appeal, and used her pictures in order to encourage other women to feel good about themselves by taking care of their bodies, minds and souls, and feeling confident in expressing their whole selves. Admiring powerful women enchanting the world with their sex appeal and confidence such as Angelina Jolie, Halle Berry or Ciara, to name a few, Plaintiff has not been afraid to express her own sex appeal and encourage other women to take care of themselves and be proud of their bodies, minds and souls, nourishing them and becoming the best version of themselves.

For the Halloween of 2014, Plaintiff wanted to embody both femininity and confidence, and decided to wear a Cat Woman costume meant to resemble the one worn by Halle Berry in the movie Cat Woman. Therefore, she created her own costume by matching a sexy lace shirt, boy shorts, fishnet stockings, lace gloves, kitty cat ears and over the knee boots. Plaintiff initially bought the costume from Ebay, and then came up with the idea of building her own costume with the elements exposed above. This picture has been taken out of context, used and re-used by newspapers such as New York Post, then by Gothamist where Plaintiff was called names such as "hooker", "sex worker", etc, then again used by a convicted felon who did 10 years in jail for raping a woman after he drugged her up at a club and raped her in the bathroom. This convicted felon verbally abused Plaintiff calling her a "hooker", "hoe", "bitch" and linked his article to an article written in December 2015 by the New York Post, even though he wrote his article a year after that in 2017. When that happened plaintiff was told by a stranger on the street that she deserves being verbally abused by that convicted felon online, that will teach her to never cheat

and break-up with a Pakistani boyfriend because of another black man she might like. The convicted felon was black.

Halle Berry was very sexy and perfectly played a dualistic type of personality in Cat Woman, showing a sensitive and shy self as well as a powerful, sexy and confident self. Plaintiff admired the actress and the way she defined the different sides all women have to some degree, and which have to be all expressed in balance for a whole persona to emerge and wanted to embody that in her Halloween costume. Instead of enjoying a simple Halloween costume, Plaintiff was viciously attacked and called names such as hooker, by anonymous commenters posting comments in response to an article posted by the newspaper Gothamist.

Throughout the years Plaintiff has always been concerned with taking care of her body, mind and soul, and in her first book published in March 2015, she wrote about all of these things, offering advice from all angles such as connection with a higher self and divinity, understanding of quantum physics, the physical manifestation of energy in waves or particles, creation of reality through thoughts and emotions, relationship management, finances, career, diet, exercise etc. Copyright is the lawful right of an author, artist, composer or other creator to control the use of his or her work by others.  Generally speaking, a copyrighted work may not be duplicated, disseminated, or appropriated by others without the creator's permission.  The public display or performance of copyrighted works is similarly restricted, and the unauthorized use of a copyrighted work constitutes copyright infringement. Visual works of art, such as Plaintiff's modeling pictures created through selfies or collaborations with photographers represent such works and willful copyright infringement was committed, also leading to character assassination and destruction of a business which was being developed.

Publishers of newspapers both in print and online content, diverse websites with online content, exposed themselves to willful copyright infringement when they copied and published in their articles and websites the photos which Plaintiff had a copyright on, those done with a photographer as well as the selfies, since all were used on social media, Plaintiffs website and books in order to promote her coaching business. These publishers did not:

A) Ask or obtain a license to use the image from Plaintiff. Beyond privacy, the rights to profit and exploit the image were taken from Plaintiff, the purpose of the photos destroyed, and a character assassination and mutilation of Plaintiff's public image, business and persona.

28

B) Plaintiff did not warrant usage of her copyrighted pictures, and moreover, the infringers gave rise to more infringement since they did not obtain an intellectual property indemnification clause protecting them for future infringement risen from the initial infringement committed by them. Besides the copyright infringement done by the initial newspapers copying and using the pictures in their articles, a multitude of websites and other smaller newspapers then linked themselves to the original articles and committed copyright infringement again and again by constantly uploading Plaintiff's pictures online.

C) When faced with DMCA and Copyright infringement letters coming from Plaintiff, some of the infringers refused to take down the photos used illegally and kept them on their platform giving rise to constant humiliation, exposure to danger, harassment and character assassination of Plaintiff.

Plaintiff's website, Facebook and Instagram accounts automatically established copyright over the content published there and mentioned that on the website as well as the books published by Plaintiff which contained her photos, both taken at modeling photoshoots or taken as selfies.

In the US, fair use allows for limited use of copyrighted material without authorization from the author of the creative work. The purpose of fair use is to provide limited use if it benefits the public and only if it mentions the copyright work or uses a small portion. In this case there was no limited use of the creative work, since the creative work was copied in its entirety and illegally used in articles reporting on something that did not have anything to do with the pictures, respectively a lawsuit regarding breach of contract. Moreover, this fair use has to benefit the public. Through the infringement the public did not have anything to gain, and if the intent was to report on the news of a lawsuit filed against Plaintiff, then the articles could have been written without usage of the pictures, since the pictures were not the news reporting topic. Instead, the infringement was done in order to generate sales for those committing the infringement, created scandal, destroyed Plaintiff's business, life and produced character assassination.

Plaintiff was harmed by the negative publicity created by defendants, was cyberbullied online and on her daily life outside of the confines of a home.

These defendants did not stay and pondered on what they are reporting on, and how they are reporting on a fraudulent lawsuit filed by 357 W 54th St, Misrahi Realty, a Plaintiff which has

been accused by a whole building of tenants for using harassment tactics in order to force them to leave their rent controlled apartments so that Misrahi could renovate them and make a higher profit. Same Misrahi Plaintiff has been accused of aggravated harassment and lost a $5 million dollars lawsuit with criminal charges attached to one of their employees due to the bullying late night calls he made to a commissioner named Marcia Lemmons, where he would threaten her by saying things such as "we'll get you", meaning we will kill you. Apparently, Marcia Lemmons wanted to keep the neighborhood free of sex shops, late night bars etc in the area, and that was not aligned with the business plans Misrahi Realty had in the same neighborhoods.

Plaintiff has also recently been told by a stranger on the street that she should not forget that even if Marcia Lemmons won $5 million dollars, afterwards she paid with her life for that money, and if Ms. Iacob insists on exposing the fraud, illegal trespassing and anything else, then she might have the same fate as Marcia Lemmons. Plaintiff has been constantly threatened and told that herself and her family will be targeted for life and that her future children will be targeted, and her only choice is to give up the lawsuit against 357 W 54th St and agree to become a sexual slave so "she can pay for her sins", never talk about the sexual harassment suffered, never talk about the fraud committed or anything else related to these matters.

**There are six basic rights protected by copyright.** The owner of copyright has the exclusive right to do and to authorize others to do the following:

A) To reproduce the work in copies

B) To prepare derivative works based upon the original work

C) To distribute copies or phonorecords of the work to the public by sale or other transfer of ownership, or by rental, lease, or lending

D) To publicly perform the work, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works

E) To publicly display the work, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work.

Plaintiff had the right to promote her business and had automatic copyright ownership over the images she used on her social media platforms, books and website in order to promote herself as a coach and her coaching business. Moreover, Plaintiff was a model and had an intent of promoting female empowerment, therefore celebrating sensuality and confidence. She was

posting pictures where she would express not only regular lifestyle photography, but also pictures meant to inspire women to a confident attitude of expression of sex appeal and sassiness. For the Halloween of 2015, Plaintiff again wore a sexy Cat Woman suit along with a statement of unafraid expression of female sensuality and bashing of hypocritical and prejudiced attitudes meant to restrict women and have them wear garbage bags and baggy clothing in order to prevent attacks from males who act like animals and can't control their instincts of a sexual predator nature.

These newspapers were never interested in what the truth of the news is, or interested in updating their articles or take them down when Plaintiff brought forward evidence of fraud and illegal trespassing committed by 357 W 54th St did starting with May 2015, when Adrian Ally, Misrahi's employee illegally entered Plaintiff's apartment for inspections apparently. Plaintiff did not receive any violation until July 6th, 2015, therefore in May there was no complaint and no violation that even required an inspection of the apartment. The illegal entry was done and threats left, after which Plaintiff started being asked to give money to 357 W 54th St and unofficially on the street verbally and physically attacked and told she needs to accept to become a sexual slave and make money in that manner, and pay for her sins.

To bring a copyright infringement lawsuit, a copyright holder must establish ownership of a valid copyright and the copying of constituent elements of the work that are original. A plaintiff establishes ownership by authorship (by the plaintiff itself or by someone who assigned rights to the plaintiff) of

    A) an original work of authorship that is

    B) fixed in a tangible medium (e.g. a book, website, social media platforms such as Facebook and Instagram, Twitter etc.)

Plaintiff here through the attached evidence shows she has a valid copyright, she is attaching the certificates, which are prima facie evidence, she is attaching the dates and screenshots of when the pictures were first published by plaintiff, the screenshots of where the infringement took place. Plaintiff is the holder of a valid copyright and shows that illegal and willful copyright infringement was produced by the copying of her original works, as well as her original works being transformed and destroyed through the repackaging and the message sent to online and offline readers and viewers, in articles which were not commenting or were about the pictures in

question, but about a lawsuit that could have been reported on without committing copyright infringement.

The copyright owner must also establish both:

  A) actual copying and

  B) improper appropriation of the work.

Plaintiff is providing evidence of actual copying of her pictures by presenting as evidence screenshots showing the usage of her pictures by defendants, as well improper appropriation of the work. Moreover, Plaintiff tried to regain her copyright rights after infringement and her demands refused, while her pictures have been constantly uploaded and reuploaded online on multiple sites, causing character assassination. Defendants had access to plaintiff's pictures since plaintiff had her pictures published on Facebook, Instagram, her website and book, and it was a public medium made in order to promote her business by building a following, and that allowed defendants to take advantage of plaintiff's pictures, copy the sexiest ones and use them in articles in order to generate sensationalism and generate more profits, because sex-appeal always sells. As mentioned by law, registration is not required to establish copyright protection, as long as the prima facie elements are established, but registration is necessary before bringing a lawsuit and Plaintiff obtained that registration, therefore she is entitled to filing this lawsuit for willful copyright infringement, and she registered the pictures within 5 years of first publication, therefore her copyright is valid.

"A plaintiff sustains its burden of proving willfulness "by showing defendants knew or should have known they infringed upon the Plaintiff's copyrights. Willful copyright infringement does not require a showing of actual knowledge. To prove willfulness, plaintiff may show that the infringers had actual or constructive knowledge that it was infringing the plaintiffs' copyrights or that the infringer acted in reckless disregard of the high probability that it was infringing plaintiffs' copyrights. Plaintiff has sent copyright infringement letters to each defendant, and they were ignored by some such as dailynews.co.uk and NY Post.

Plaintiff is also attaching here evidence of the identity and addresses of the defendants she was able to locate on the internet in order for those committing copyright infringement to be served with a Summons and Complaint.

Plaintiff is bringing this action in court for copyright infringement and wants to seek actual damages resulted from the infringement done on her copyrights, and also seeking monetary

restitution from the profits defendants made all these years by using her pictures on their websites, and in sales produced when the newspapers were sold in print.

Respectfully yours,
Madalina Iacob







 daredevil. Dance your life away. Unleash your
free Coaching eBook on Self Love at www.lifecoachin
First publication

Dundee Gravure

 imi plece



 Ender Husref, Nexal

*First place*

Etchebest

Adeugl a





First
publication





set = pb.1572250061.-220752000.1568746109.&type=3&theater   *First publication*

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Acting United States Register of Copyrights and Director

**Registration Number**
**VAu 1-277-919**
Effective Date of Registration:
February 15, 2017

---

## Title

**Title of Work:** Business lifestyle

## Completion/Publication

**Year of Completion:** 2009

## Author

- **Author:** Daniel Norton
  **Author Created:** photograph
  **Domiciled in:** United States

- **Author:** Madalina Iacob
  **Author Created:** photograph
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Madalina Iacob
209 W 80th st, apt 4B, New York
**Transfer statement:** by written agreement

## Rights and Permissions

**Name:** Madalina Iacob
**Email:** mada_iacob13@yahoo.com
**Telephone:** (347)280-4512

## Certification

**Name:** Madalina Iacob
**Date:** February 15, 2017

**Correspondence:** Yes

Page 1 of 1

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code,* attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Acting United States Register of Copyrights and Director

**Registration Number**

**VA 2-053-355**

**Effective Date of Registration:**
February 15, 2017

---

## Title

**Title of Work:** Woman in purple dress

## Completion/Publication

**Year of Completion:** 2015
**Date of 1st Publication:** March 20, 2015
**Nation of 1st Publication:** United States

## Author

- **Author:** Brian Moak
  **Author Created:** photograph
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:**
Madalina Iacob
209 W 80th st, apt 4B, New York
**Transfer statement:** by written agreement

## Rights and Permissions

**Name:** Madalina Iacob
**Email:** mada.iacob13@yahoo.com
**Telephone:** (347)280-4512

## Certification

**Name:** Madalina Iacob
**Date:** February 15, 2017

**Correspondence:** Yes

Page 1 of 1

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-288-413

**Effective Date of Registration:**
February 15, 2017

---

## Title

**Title of Work:**    Woman in green shirt and black skirt sitting by the water

---

## Completion/Publication

**Year of Completion:**   2013

---

## Author

- **Author:**   Madalina Iacob
  **Author Created:**   photograph
  **Citizen of:**   Romania
  **Domiciled in:**   United States

---

## Copyright Claimant

**Copyright Claimant:**   Madalina Iacob
   209 W 80th st, apt 4B, New York, NY, 10024, United States

---

## Rights and Permissions

**Name:**   Madalina Iacob
**Email:**   mada_iacob13@yahoo.com
**Telephone:**   (347)280-4512

---

## Certification

**Name:**   Madalina Iacob
**Date:**   February 15, 2017

---

Page 1 of 1

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*[signature]*

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-288-416

**Effective Date of Registration:**
February 15, 2017

---

### Title

**Title of Work:** Woman in short black tank on boat

---

### Completion/Publication

**Year of Completion:** 2011

---

### Author

- **Author:** Madalina Iacob
  **Author Created:** photograph
  **Citizen of:** Romania
  **Domiciled in:** United States

---

### Copyright Claimant

**Copyright Claimant:** Madalina Iacob
209 W 80th st, apt 4B, New York, NY, 10024

---

### Rights and Permissions

**Name:** Madalina Iacob
**Email:** mada_iacob13@yahoo.com
**Telephone:** (347)280-4512

---

### Certification

**Name:** Madalina Iacob
**Date:** February 15, 2017

---

# Certificate of Registration

This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

Acting United States Register of Copyrights and Director

**Registration Number**

**VAu 1-288-412**

**Effective Date of Registration:**
February 15, 2017

---

## Title

**Title of Work:** Woman in floral top and black skirt

## Completion/Publication

**Year of Completion:** 2013

## Author

- **Author:** Madalina Iacob
  **Author Created:** photograph
  **Citizen of:** Romania
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Madalina Iacob
209 W 80th st, apt 4B, New York, NY, 10024, United States

## Rights and Permissions

**Name:** Madalina Iacob
**Email:** mada_iacob13@yahoo.com
**Telephone:** (347)280-4512

## Certification

**Name:** Madalina Iacob
**Date:** February 15, 2017

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Acting United States Register of Copyrights and Director

**Registration Number**

**VAu 1-288-415**

**Effective Date of Registration:**
February 15, 2017

---

## Title

| | |
|---|---|
| **Title of Work:** | Woman in Halloween Costume |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2014 |

## Author

| | |
|---|---|
| • **Author:** | Madalina Iacob |
| **Author Created:** | photograph |
| **Citizen of:** | Romania |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Madalina Iacob |
| | 209 W 80th st, apt 4B, New York, NY, 10024, United States |

## Rights and Permissions

| | |
|---|---|
| **Name:** | Madalina Iacob |
| **Email:** | mada_iacob13@yahoo.com |
| **Telephone:** | (347)280-4512 |

## Certification

| | |
|---|---|
| **Name:** | Madalina Iacob |
| **Date:** | February 15, 2017 |

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Signature*

Acting United States Register of Copyrights and Director

**Registration Number**

**VAu 1-288-417**

**Effective Date of Registration:**
February 15, 2017

---

## Title

**Title of Work:** Woman in pink shirt

## Completion/Publication

**Year of Completion:** 2014

## Author

- **Author:** Madalina Iacob
  **Author Created:** photograph
  **Citizen of:** Romania
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Madalina Iacob
209 W 80th st, apt 4B, New York, NY, 10024

## Rights and Permissions

**Name:** Madalina Iacob
**Email:** mada_iacob13@yahoo.com
**Telephone:** (347)280-4512
**Address:** 209 W 80th st
apt 4B
New York, NY 10024

## Certification

**Name:** Madalina Iacob
**Date:** February 15, 2017

---

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.



Acting United States Register of Copyrights and Director

**Registration Number**

**VAu 1-288-414**

**Effective Date of Registration:**
February 15, 2017

---

## Title

| | |
|---|---|
| **Title of Work:** | Woman in short red dress with friend |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2014 |

## Author

| | |
|---|---|
| • **Author:** | Madalina Iacob |
| **Author Created:** | photograph |
| **Citizen of:** | Romania |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Madalina Iacob |
| | 209 W 80th st, apt 4B, New York, NY, 10024, United States |

## Rights and Permissions

| | |
|---|---|
| **Name:** | Madalina Iacob |
| **Email:** | mada_iacob13@yahoo.com |
| **Telephone:** | (347)280-4512 |

## Certification

| | |
|---|---|
| **Name:** | Madalina Iacob |
| **Date:** | February 15, 2017 |



Work in new and powerful ways.

The landlord is now seeking $250,000 from Iacob (left) to cover the fines the building faces and another $50,000 in legal fees

Yahoo Mail - Daily mail Facebook page







...to catch Jacob renting out her apartment on Airbnb because the
...rtment with no doorman. But city inspectors found guests in Jacob's apartment
...time between May and October

the family h           ...ortedly found the apartment on Airbnb...        ...they rented it from
a woman named Ramona.

In September, Jacob was is indeed involved in a short-term rental scheme and as a
...subject imposed a substantial penalty based on chronic bad acts, a city
...according to the lawsuit

scallywagandvagabond.com/2015/12/madalina-iacob-sued-300k-by-landlord-for-illegal-airbnb-rentals/

# Madalina Iacob sued for $300K by landlord for illegal Airbnb rentals

DECEMBER 18, 2015 BY CHRISTOPHER KOULOURIS



f   Share on Facebook



Share on Twitter



How one NYC tenant, Madalina Iacob has caused her landlord, 357 West 54th LLC ire after illegally renting out her apartment on Airbnb. Images via facebook.

## LATEST ON SCALLYWAG AND VAGABOND









165 unread |  m...box...

scallywagandvagabond.com/2015/12/madalina-iacob-sued-300k-by-landlord-for-illegal-airbnb-rentals/

Madalina Iacob sued for $300...



3/4

## TAKE A LOOK

**LEAKED: Secret Brain Drug Stirs Controversy**

**7x Lotto Winner: Lottery Isn't As Random As You Think**

**The Unusual Link Between Your Toes and Alzheimer's**

**15 Cancer Causing Foods You Probably Eat Every Day**

**Odd Chinese Remedy 'Destroys' Nail Fungus in 1 Day**

**Men, No Viagra Needed When You Do This**

**New Denture Technology Now Available to Public**

**No Need to Diet or Go to the Gym If You Do This Before Bed**

**The Diabetes Breakthrough Your Doctor Won't Tell You About**

**1 Odd Method 'Restores' Your 20/20 Vision. Try This Tonight**

Powered by



New Denture Technology Now Available to Public

No Need to Diet or Go to the Gym If You Do This Before Bed

The Diabetes Breakthrough Your Doctor Won't Tell You About

1 Odd Method 'Restores' Your 20/20 Vision. Try This Tonight

Powered by

(1)7186: unread) : me...

scallywagandvagabond.com/2015/12/madalina-iacob-sued-300k-by-landlord-for-illegal-airbnb-rentals/

Madalina Iacob sued for $300...

fine, and to pay $50,000 in legal fees.

Iacob has since responded that she intends to hire a lawyer and fight the charges against her. Indeed.









## Nydailynews infringement

From: Madalina Iacob (madalinaiacob3000@gmail.com)

To: mada_iacob13@yahoo.com

Date: Wednesday, September 18, 2019, 10:37 AM EDT





The media has officially lost its damn mind



qrealtyny.com/midtown-renter-slapped-with-300k-lawsuit-for-using-airbnb/

Qrealty

GROUP

ABOUT US   SALES   RENTALS   CONTACT US

718-786-3000

# Midtown renter slapped with $300k lawsuit for using Airbnb



The landlord of the Midtown building at 357 West 54th Street is suing a tenant for $300,000 for renting out her apartment on Airbnb. (more...)

Madalina Iacob and 357 West 54th Street



328

(11716?) unread) - mada.jacol  ×  |  Mental Health Resources: 81  ×  |  Connect Directory - VictimCor  ×  |  Apartments, Renting and The  ×

https://www.pinterest.com/pin/454722893606623024/

# Explore Renting, Airbnb, and more!

Apartments   Renting   The building   Hard to   Building   Articles   News   Women's   The o'Jays





from Mail Online

**NYC woman is sued for $300K by landlord for subletting on Airbnb**

| Landlord | The Building | 50 000 |

The landlord is now seeking $250,000 from Jacob (left) to cover the fines the building faces and another $50,000 in legal fees



Michelle Noel
Heels





from Mail Online

**NYC woman is sued for $300K**



Michelle Noel

**Love Shoes Sandals   Pretty Sandals**

XoXo
See More
from nastygal.com



**Shoe Sexy High Heels   Steps Heels**

This website is for sale! is your first and best source for all of the information you're looking for. From general topics to more of what you would expect to find here, has it all. We hope you find what you are searching for!

See More
by Yahoo Shine

There's more to see on Pinterest!

Log in          Continue

(117166 unread) - mada_iacol x | Mental Health Resources: 8T / x | Connect Directory - VictimCor x | Madalina Iacob sued for $30C x

https://disqus.com/home/discussion/scallywagandvagabondcom/madalina_iacob_sued_for_300K_by_landlord_for_illegal_Airbnb

Madalina Iacob sued for $30C  x

Low Battery
Your Mac will sleep soon unless
plugged into a power outlet.

Close

scallywagandvagabond.com · a year ago

## Madalina Iacob sued for $300K by landlord for illegal Airbnb rentals

Madalina Iacob a self confessed emotional intelligence coach and life coach (along with yoga instructor and part time model) has found he...

scallywagandvagabond.com

**2 Comments**

● Recommend     ⬆ Share     ···

Best    Newest    Oldest



Learn More

Sponsored by Chatter Box Daily

## Rumors Have Been Confirmed, Jolie Comes Clean

The Rumors Have Been Confirmed, Jolie Comes Clean - Will Family And Friends Forgive Her?



Join the discussion...

Arman Karimi · a year ago

·
· · ··
· · · ··
·       ·
·
·   ·
·       · ·
·
·       ·
· · ·       ·
·       · ·
·       ·
·           ·

**There's more to talk about...**

Great discussions are happening here on Disqus. You'll never be bored.

**Join Disqus**

▦ **Channels on Disqus**

QBA is a place to ask HUMOROUS questions. No politics, religion or personal advice. Please read the Community Guidelines before posting or commenting. Thank You.

Questions & Answers        **Visit**



GIFs

Exclusive GIFs, memes and

(117167 unread) - snada_lacol × | Mental Health Resources: BT × | Connect Directory – WedimCon × | Midtown renter slapped with × ×

www.bantamrealtyservices.com/midtown-renter-slapped-with-300k-lawsuit-for-using-airbnb/

# BANTAM
REALTY SERVICES, LLC

HOME   ABOUT   SERVICES ˅   LISTINGS   REQUIREMENTS   CONTACT





# Midtown renter slapped with $300k lawsuit for using Airbnb

Posted on December 19, 2015   /   Under News   /   With 0 Comments

Madalina Iacob and 357 West 54th Street

The landlord of the Midtown building at 357 West 54th Street is suing a tenant for $300,000 renting out her apartment on Airbnb. (more...)



LG Estates Inc.
@LgEstatesInc

Home
About
Reviews
Photos
Likes
Posts

Create a Page

E.S.T.A.T.E.S

Write a comment...

👍 Like    🗨 Follow    ➦ Share    •••

LG Estates Inc.
19 December 2015 · 🌐

Midtown renter slapped with $300k lawsuit for using Airbnb
http://therealdeal.com/.../tenant-slapped-with-300k-lawsuit-.../

CEO - Laverne Coulbourne

LG Estates

**Midtown renter slapped with $300k lawsuit for using Airbnb**

The landlord of the Midtown building at 357 West 54th Street is suing a tenant for $300,000 renting out her apartment on Airbnb. Tenant Madelina Iacob is accusee...

THEREALDEAL.COM

👍 Like    🗨 Comment    ➦ Share

Like · Comment

1 Like

Thank you for the invitation.

Harry Vaughan
16 December 2012 at 21:12 · 🌐

Like · Comment

People Also Like

NYC Apartment Homes
Local service                              👍 Like

Privilege
Firm                                        👍 Like

Nate Young's Basketball...
Athlete                                     👍 Like

Property investment in New York, New York

English (UK) · English (US) · Español ·
Português (Brasil) · Français (France)

+

www.opposingviews.com/i/society/new-york-city-tenant-sued-300k-landlord-over-airbnb-rental-fines

# New York City Tenant Sued For $300K By Landlord Over Airbnb Rental Fines

December 20, 2015 | by **Kathryn Schroeder**



*Opposing Views*



A New York City, New York, landlord is suing a tenant for $300,000 because she repeatedly rented out her apartment on Airbnb for $200 a night.

The landlord claims in his lawsuit that tenant Madalina Iacob has cost the building ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~Airbnb listing, the New York Daily News reports.



Weird '50s Sports You
Didn't Know Existed



Clowns
Appearing All Over
America



Cop Busts Out With



*Madalina Iacob and 357 West 54th Street*

The landlord of the Midtown building at 357 West 54th Street is suing a tenant for $300,000 for renting out her apartment on Airbnb.

Tenant Madalina Iacob is accused of costing the building over $60,000 in fines after repeatedly renting out her apartment for $200 a night on short term rentals sites including Airbnb, according to the New York Daily News.

"Under the law, the landlord is strictly liable even though it's the tenant causing the

Koraugi Publishing

## Subscribe to our e-Lerts

Email address

**New York Real Estate News**
☑ Daily Updates
☑ Weekly Roundup

**Hamptons Real Estate News**
☑ Weekly

**South Florida Real Estate News**
☑ Daily Updates
☑ Weekly Roundup

**Los Angeles Real Estate News**
☑ Daily Updates
☑ Weekly Roundup

**China Watch**
☑ Weekly Roundup

FILED
S. DISTRICT COURT

28 JUN 15 AM II: 04

S.D. OF N.Y.W.P.

FILED
U.S. DISTRICT COURT

2020 JUN 15 AM II: 04

S.D. OF N.Y.W.P.

PRIORITY MAIL
POSTAGE REQUIRED

Please Recycle



This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14 © U.S. Postal Service; October 2018; All rights reserved.

FROM: Madalina Jacob
WIEE 3750 Hudson Manor Terrace
Bronx, NY 10463

TO:

300 Quarrypus St
White Plains, NY

Please Print / Clerks Office
Filing of Copyright Infringement
Lawsuit

To schedule free
Package Pickup,
scan the QR code.



DuPont™ Tyvek®
Protect What's Inside.™